Appeal of WRIGHT'S AUTOMATIC    Docket No. 1837.
TOBACCO PACKING MACHINE CO.

A taxpayer corporation, which, upon its organization, issues its entire capital stock for tangible property and intangible property consisting of a patent and a contractual right to future additions thereto and improvements by the inventor, may not include such intangible property in invested capital at a value equal to the difference between the total stock issue and the proven value of the tangible property, where the only evidence produced to sustain the alleged value of intangibles was a statement of gross earnings for a 20-year period after the assets were acquired and an unknown portion of such earnings was derived from patents perfected or purchased during that period.

Statements of gross earnings for years prior and subsequent to 1913 derived from patents expiring at different times, some of which expired prior to 1913, some after 1913 and before the taxable years in question, and some of which were acquired after 1913, are alone insufficient as a basis for computing depreciation on patents owned by a taxpayer on March 1, 1913.

Submitted April 30, 1925; decided May 27, 1925.

*E. S. Parker, Jr., Esq.,* and *J. L. Elliott, C. P. A.,* for the taxpayer.

*J. Harry Byrne, Esq.,* for the Commissioner.

Before STERNHAGEN, TRAMMELL, PHILLIPS, and LOVE.

This appeal involves income and profits taxes for the calendar years 1919, 1920, and 1921. The amount in controversy is less than $10,000. The taxpayer alleges error on the part of the Commissioner in failing to allow depreciation on patents owned by the corporation on March 1, 1913, and in eliminating the entire capital stock of the corporation in computing its invested capital.

FINDINGS OF FACT.

The taxpayer is a West Virginia corporation, organized September 6, 1893. Previous to the date of the organization of the taxpayer, R. H. Wright had acquired and owned a patent, No. 502637, upon a device invented by one William Rose for wrapping and securing tobacco in packets, which patent was issued August 1, 1893. He also had a contract with Rose for any improvements or additions which might be made to the original patent. He also owned certain machines which embodied the patent, and other tangible property of a value of at least $25,000. This patent and tangible property and the contract with Rose were conveyed to the corporation upon its organization in exchange for the capital stock of the corporation of the par value of $250,000. The tangible property at that time had a value of at least $25,000. The taxpayer claims that the patent and the contract with Rose had a cash value at that time of $225,000, and that this amount should be allowed in computing its invested capital.

In 1895 the corporation secured the issuance of patent No. 540260, dated June 4, 1895, which patent covered a stamping and labeling

machine. This patent was developed by an employee of the taxpayer, and the development expenses were paid out of earnings.

In 1897 William Rose had developed an improvement and addition to the original 1893 patent, and a patent, No. 586076, for this improvement and addition was issued to the taxpayer June 6, 1897. This patent was obtained from Rose as a part of the original contract between him and Wright, which had been assigned to the taxpayer. This addition covered such an improvement that machines manufactured under the original patent were junked. Wright testified that this was the most important patent obtained by the company until 1912.

On December 7, 1897, a patent, No. 594968, covering another addition to the original patent, developed by William Rose, was issued to the taxpayer.

In 1901 there was issued to the taxpayer patent No. 683651, for a stamping and labeling machine, which patent was developed by employees of the taxpayer.

On January 27, 1903, there was issued to the taxpayer patent No. 719374, for a rotary feed attachment to the packing machine. This was an improvement by Rose upon the original 1893 patent and was obtained by the taxpayer under the terms of the original contract with him.

On June 7, 1904, there was issued to the taxpayer patent No. 762255, for a packing machine, also developed by Rose and acquired by the taxpayer under the contract with him. This device was largely used.

On July 19, 1904, there was issued to the taxpayer patent No. 765316, for a paper feeder, developed by an employee of the taxpayer.

On June 12, 1906, there was issued to the taxpayer patent No. 822988, for a tobacco packing machine which had been developed by Rose and was acquired by the taxpayer under the original contract.

On March 7, 1911, there was issued to R. H. Wright patent No. 985939, for a package-indicating machine developed by Rose and which was the property of the taxpayer, acquired under the Rose contract.

On April 25, 1911, there was issued to the taxpayer patent No. 990532, for a labeling and stamping machine, developed by Louis Fischer, an employee of the taxpayer.

On May 9, 1912, Wright applied for a patent upon a device for introducing charges into receptacles, and on June 9, 1914, there was issued to him patent No. 1099791 covering this device, and known as the Fischer Split Tube and Saddle Patent. This patent was developed by an employee of the taxpayer and was the property of the taxpayer. It was used for packing tobacco in cans.

On May 15, 1912, Wright applied for a patent upon a device for introducing charges of material into receptacles through a tube, and on November 11, 1913, there was issued to Wright patent No. 1078492, covering this device, which was also known as the Fischer Split Tube and Saddle Patent. This patent was likewise developed by an employee of the taxpayer and was the property of the taxpayer. It was used for packing tobacco into bags.

In or about 1908 or 1909, the taxpayer acquired patent No. 620637, for a wrapping machine, at a cost of $51,370.72, which was charged to expense. This patent was dated March 7, 1899.

The gross earnings of the taxpayer from the date of its organization in 1893 to March 1, 1913, and the disposition made of a portion thereof, are shown in the following tabulation:

| | |
|---|---:|
| Gross profits from machines sold from organization of company in 1893 to March 1, 1913 | $276,541.07 |
| Royalties received for above period | 86,813.68 |
| **Gross receipts** | 363,354.75 |
| Paid out in dividends earned | 160,000.00 |
| Paid out account Landfear stamping and labeling machine | 24,055.40 |
| Paid out account weigher, first | 691.50 |
| Paid for Bohl patent, packet | 51,370.72 |
| Paid for patent improvements, cost of taking out sundry patents | 914.46 |
| Paid account Fischer stamping and labeling machine | 19,797.19 |
| Weigher patents, and machine | 6,117.47 |
| **Paid prior to March 1, 1913** | 262,946.74 |
| Paid salaries of inventors and paid machine shops in developing patents prior to March 1, 1913 | 64,545.15 |
| | 327,491.89 |

The gross profits of the corporation from June 18, 1914, to December 31, 1922, were as follows:

| | |
|---|---:|
| June 18, 1914, to December 31, 1915 | $12,544.53 |
| December 31, 1915, to December 31, 1916 | 62,841.10 |
| December 31, 1916, to December 31, 1917 | 26,542.97 |
| December 31, 1917, to December 31, 1918 | 24,476.20 |
| December 31, 1918, to December 31, 1919 | 60,556.49 |
| December 31, 1919, to December 31, 1920 | 34,365.73 |
| December 31, 1920, to December 31, 1921 | 24,642.47 |
| December 31, 1921, to December 31, 1922 | 24,873.30 |
| **Total** | 300,846.79 |
| **Yearly average** | 35,392.74 |

The net profit for the year 1914, shown by the return of the taxpayer was $776.89, after deducting $12,319.16 as losses due to experiments on machines which proved to be failures.

At its inception the company built its machines and rented them to the users upon a royalty basis, retaining title in itself. Due to competition, this practice was soon abandoned, and the taxpayer thereafter sold the machines embodying its patented devices. These machines were built for the taxpayer by independent contractors, and the amounts of gross income set out above represent amounts received by the taxpayer in excess of the cost to it of the manufacture of such machines. The taxpayer had no manufacturing plant of its own; did not manufacture such machines itself; and confined its business entirely to inventing machinery for use in the tobacco business and to the sale of the machinery embodying such inventions.

At the hearing the president of the taxpayer corporation testified that he considered the various patents owned by the taxpayer on March 1, 1913, to have a value of more than $300,000.

### DECISION.

The deficiency should be recomputed in accordance with the following opinion. Final decision will be settled on consent or on ten days' notice, in accordance with Rule 50.

### OPINION.

PHILLIPS: The taxpayer alleges two errors on the part of the Commissioner: (1) That the entire capital stock has been eliminated in computing invested capital; and (2) that depreciation has not been allowed on patents owned by the corporation and valued on March 1, 1913, at $225,000.

Prior to the organization of the taxpayer corporation in 1893, R. H. Wright had secured a patent upon a device for packing tobacco, which had been invented by one Rose and assigned to Wright. He had also secured a contract from Rose for the assignment by Rose to him of any improvements that Rose might make. Several machines had been made under the patent and were in operation upon a royalty basis, title to them remaining in Wright. On the organization of the taxpayer corporation Wright set over to it these machines and all other assets of the business previously conducted by him, and assigned to it this patent and all his interest in the contract with Rose, and in payment the company issued to Wright all its capital stock of a par value of $250,000. The cash value of the tangible assets for which the stock was issued was $25,000. It is claimed that the cash value of the intangibles at the time was $225,000 and that this should be allowed as invested capital. The only evidence to sustain this contention is that during the following twenty years the gross earnings of the taxpayer were $363,354.75, an unknown portion of which, however, was from patents perfected or purchased after 1893. In these circumstances the taxpayer should be allowed to include $25,000 in its invested capital on account of stock issued for tangible property, but nothing can be allowed for the stock issued for the patents.

Upon the question of depreciation we are again confronted with lack of proof of the cost or March 1, 1913, value. The taxpayer relies upon the gross earnings of the business from 1893 to 1913, and from 1914 to 1922. These earnings, however, were from a number of patents expiring at different times, some of which expired prior to 1913, some after 1913 and before the taxable years in question, and some of which were acquired after 1913. It appears that the taxpayer had spent considerable sums in acquiring and developing patents, but whether these sums were for patents which were still valid in the taxable years in question we were unable to ascertain, except it did appear that patent No. 620,637, issued March 7, 1899, was acquired in 1908 or 1909 at a cost of $51,370.72. This patent, however, had expired prior to the taxable years in question. The taxpayer has failed to establish any basis upon which depreciation can be computed.